# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE TOLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-5530 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Valerie Tolson filed this civil rights action against the City of Chicago ("City") on July 13, 2012, alleging discriminatory termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C. § 621 *et seq.* Before the Court is the City's motion for summary judgment [105]. For the reasons stated below, the City's motion for summary judgment [105] is granted.

## I. Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[1]: Defendant's Statement of Facts ("Def. SOF") [66], Plaintiff's Response to

---

[1] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See*, e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that

Defendant's Statement of Facts ("Pl. Resp.") [110], and the materials Plaintiff submitted in opposition to Defendant's motion ("Pl. Exhs.") [109].

Born on December 26, 1956, Plaintiff is African-American and worked for the City in its Office of Budget and Management ("OBM") as a Senior Budget Analyst from February 21, 2008 until the City fired her on November 15, 2011. A few weeks before she began her job at the City, Plaintiff signed a residency affidavit acknowledging that she understood that "as a condition of employment with the City of Chicago [she] must be an actual resident of the City of Chicago," that "falsification of this statement of address shall constitute grounds for discharge from the City Service," and that she "must report any change of address immediately to [her] department head and to [Human Resources] and that failure to provide such notification shall constitute grounds for discharge from the City Service." Def. SOF at ¶ 7 (citing Pl. Dep., 48:10-51:4 and DHR Employee Residency Affidavit, Exh. 3). On September 9, 2008 and on May 1, 2009, Plaintiff executed and submitted change of address forms, which included the same acknowledgments as the residency affidavit that she signed on February 1, 2008. *Id.* at ¶¶ 11, 12.

In the May 1, 2009 form, Plaintiff represented that she had moved from her mother's apartment on 9146 South Laflin Street in Chicago to her boyfriend's home at 8329 South Langley Avenue in Chicago. According to Plaintiff, on July 10, 2009, her boyfriend displaced her and her son from the South Langley Apartment in a domestic violence incident. *Id.* at ¶¶ 13,

---

do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement – that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

14.  Between July 10, 2009, and sometime in either July or August 2010, Plaintiff and her son lived at her mother's apartment on South Laflin Avenue in Chicago and Plaintiff's property at 14306 South LaSalle Avenue in Riverdale, Illinois, which Plaintiff had purchased in 1995.  *Id.* at ¶ 14.  In July or August 2010, Plaintiff and her son began to live in Riverdale full-time.  *Id.* at ¶ 15.  Plaintiff not only admits that she lived in Riverdale between July 2009 and March 2011, but also that she did not notify the City by submitting a change of address form during that period of time.  *Id.* at ¶ 18.  On April 1, 2011, Plaintiff and her son moved back to Chicago to an apartment at 1400 East 55th Place.  Plaintiff did not submit another change of address form until that date, and listed her East 55th Place apartment in Chicago as her new address, representing that she had moved there from her ex-boyfriend's apartment on South Langley even though Plaintiff had not lived at the South Langley address since July 10, 2009.  *Id.* at ¶¶ 17-19.

On January 7, 2010, the City's Inspector General Office ("IGO") received an anonymous complaint that Plaintiff was living at the house on South LaSalle Avenue in Riverdale, Illinois.  Two investigators from IGO went to Plaintiff's house in Riverdale, reviewed her utility bills and property taxes for that address, and interviewed Plaintiff twice, first on October 21, 2010 and then on March 29, 2011.  *Id.* at ¶¶ 19, 20, 27.  In the second interview, Plaintiff admitted that she and her son had lived at her Riverdale home since at least her first interview (October 21, 2010).  *Id.* at ¶ 28.  Plaintiff confirmed that out-of-city residency during her deposition.  *Id.* at ¶ 16 (citing Pl. Dep. 29:21-30:14). From its investigation, the IGO concluded that Plaintiff had (1) violated the City's residency requirement, (2) failed to report her change of address, and (3) falsified her change of address notification—each of these acts being violations of the Municipal Code of Chicago and the City's Personnel Rules.  *Id.* at ¶¶ 20-23, 27-30.  IGO recommended that the Department discharge Plaintiff and designate her as ineligible for rehire with the City.

Alexandra Holt, the OBM Director, received the IGO's report regarding its investigation of Plaintiff on September 22, 2011. Holt consulted with the City's Law Department and decided to terminate the Plaintiff's employment with the City on those three grounds, each of which separately would have been sufficient to justify termination. On October 24, 2011, Holt and Deputy Director Annette Plattner met with Plaintiff and notified her that her employment would be terminated effective November 15, 2011. *Id.* at ¶ 33-35.

Plaintiff filed her two-count complaint on October 24, 2011. Following discovery, Defendant filed a motion for summary judgment. Plaintiff filed a motion [74] asking the Court to deem as admitted, binding and not subject to contest in this matter all facts found and legal determinations made by the Illinois Department of Labor ("IDOL") following a hearing between the parties on July 30 and 31, 2012. The IDOL proceeding stemmed from Plaintiff's "claims that [the City] interfered with, restrained or denied her exercise of, or her attempt to exercise any of her VESSA [Illinois Victim's Employment Security and Safety Act] rights." The IDOL concluded that the City failed to engage Plaintiff in the process and to accommodate her under VESSA. Plaintiff asserted in her motion [74] that the City "may not relitigate here the IDOL's factual findings" and "legal determinations" based on the doctrines of res judicata and collateral estoppel. [74] at ¶¶ 10-12. However, upon review of clear Supreme Court and Seventh Circuit case law, the Court concluded that the IDOL's unreviewed findings of fact and conclusions of law did not bar any of the City's defenses in the present case. See [82].

II.     **Legal Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). "Although intent and credibility are often critical issues in employment discrimination cases, no special summary judgment standard applies to such cases." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013). Rather as with any case, the Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Id.* (citation omitted).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

The City argues that it is entitled to summary judgment on the Plaintiff's race and age discrimination claims because the Plaintiff cannot meet her burden of proof under either the direct or the indirect method. Plaintiff did not file a supporting memorandum or her own Rule

56.1 statement, and the Court would be within its discretion to require strict compliance with Local Rule 56.1 despite Plaintiff's *pro se* status. See, *e.g.*, *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (noting that the Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1). Accordingly, the Court could deem Defendants' Rule 56.1(a) statement as admitted and decline to consider additional facts raised by Plaintiff in her submission. Nonetheless, the Court will consider Plaintiff's response to the City's Rule 56.1 Statement of Undisputed Material Facts [109], which disputes some of the City's arguments and relies on the claim that she brought against the City under the Victims' Economic Security and Safety Act (VESSA) in the Illinois Department of Labor. See *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges").

Title VII makes it "unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)). The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, makes it unlawful for an employer to discriminate against any employee "because of" that individual's age. *Id.* § 623(a). To prove either claim, Plaintiff must show that she was the victim of intentional discrimination based on her race or age and can do so either by the direct method or the indirect, burden-shifting, method.

## A.    Direct Method

Under the direct method, Plaintiff must show that the City made the decision to fire her "on an impermissible discriminatory basis." *Andrews v. CBOCS W., Inc.,* 743 F.3d 230, 234 (7th Cir. 2014). Direct evidence is "evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Such evidence "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.,* 'You're too old to work here.')." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Plaintiff "can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Darchak v. City of Chi. Bd. of Educ.,* 580 F.3d 622, 631 (7th Cir. 2009) (citation omitted). Circumstantial evidence of discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment and (3) evidence where the employee was qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529-30, n. 4 (7th Cir. 2008).

Here, Plaintiff offers no direct evidence that she was fired because of her race or age. Plaintiff admitted in her deposition that no City employee including Holt—the Budget Director who made the final decision to terminate her—made any derogatory comments about her race or age and admitted it again in her response to the City's 56.1 statement. See Def. SOF at ¶ 49 (citing Pl. Dep., 207:12-17, 267:7-268:20); Pl. Resp. at ¶ 49. Furthermore, the record

demonstrates that Budget Director Holt did not know Plaintiff's age at the time of the decision. Def. SOF at ¶ 49, 50.

Plaintiff does suggest that the IGO report was "used merely as a smoke screen in order to justify [her] termination * * * so that the hire [sic] of Megan McNally could occur." Pl. Resp. at ¶ 31. However, the Plaintiff does not point to anything in the record that would substantiate this allegation. Moreover, it is mere speculation that the IGO conspired with both the outgoing and the incoming Budget Directors, other staff in the City's Budget Office, and the Department of Human Resources to gin up an investigation of Plaintiff to justify her termination. Def. SOF at ¶¶ 19, 24, 33. IGO began its investigation in response to an anonymous complaint that Plaintiff was violating the City's residency policy, not at the behest of the Budget Office. There is nothing in the record that suggests the Budget Office coordinated with the IGO beforehand. Plaintiff does not offer circumstantial evidence, grounded in the record, that suggests a convincing mosaic of circumstantial evidence sufficient to satisfy the direct method under Title VII or the ADEA. Although the Court must draw inferences in Plaintiff's favor as the nonmoving party, the Court may not "draw[] inferences that are supported by only speculation or conjecture." *Brown v. Advocate S. Suburban Hosp.,* 700 F.3d 1101, 1104 (7th Cir. 2012).

**B.    Indirect Method**

Under the indirect method of proof, Plaintiff must meet her initial burden by making a *prima facie* case of this intentionally discriminatory act. The *prima facie* case requires that Plaintiff establish that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015). If

Plaintiff establishes a *prima facie* case of discrimination, only then must the employer "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citation omitted). Plaintiff cannot meet her initial burden of proof on her Title VII and ADEA claims. Plaintiff can meet the first and the third prongs—she is African-American who was subject to an adverse employment action. See *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) (pointing out that these elements are often "easily satisfied"). However, Plaintiff cannot prove that she met the City's legitimate expectations nor does she offer evidence that similarly situated employees were treated differently.

The City has offered three nondiscriminatory reasons for why Plaintiff was not meeting the City's legitimate expectations and thus why the City was justified in terminating Plaintiff: (1) Plaintiff failed to notify the City when she moved out of Chicago and to Riverdale, Illinois from at least July or August 2010 to March 2011, (2) Plaintiff failed to submit a change of address form to notify the City that she had moved from the South Langley residence as of July 10, 2009, and (3) Plaintiff falsified information in her April 2011 change of address form. The Municipal Code of the City of Chicago ("MCC"), Section 2-152-050, entitled "Residence Restrictions," provides that all City employees must reside in the City.

> All officers and employees of the city shall be actual residents of the city. Any officer or employee who shall fail to comply with the provisions of this section shall be discharged from the service of the city in the manner provided by law.

MCC § 2-152-050. The Illinois Supreme Court has interpreted the City's Municipal Code's use of the term "actual resident" to be "synonymous with domicile, which has been defined as 'the place where a person lives and has his true, permanent home, to which, whenever he is absent, he

has an intention of returning.'" *Fagiano v. Police Bd. of City of Chi.*, 456 N.E.2d 27, 29-30 (Ill. 1983) (quoting *Peirce v. Peirce* 39 N.E.2d 990, 993 (Ill. 1942)).

Plaintiff completed four Residency Affidavit or Change of Address Forms during her employment with the City. See *Fagiano,* 456 N.E.2d at 31 (concluding that a reasonable person considering the City's residence requirement "would have sufficient guidance in order to comply with the ordinance and rule"). On February 1, 2008, Plaintiff completed and signed the City's Employee Residency Affidavit, listing 7839 South Phillips Avenue, Chicago, Illinois 60649 as her address. On September 9, 2008, Plaintiff completed the City's Employee Change of Address Form, declaring that effective September 14, 2008, her new address would be 9146 South Laflin Street, Chicago, Illinois 60620. On May 1, 2009, Plaintiff completed another Employee Change of Address Form declaring that her new address was 8329 South Langley Avenue in Chicago. And finally, on April 1, 2011, Plaintiff submitted a third Change of Address form declaring 1400 East 55th Place Unit 215S Chicago, IL 60637 to be her address. Each of these four documents contained the following language:

> I understand and acknowledge that as a condition of employment with the City of Chicago I must be an actual resident of the City of Chicago. I understand that the falsification of this statement of address shall constitute grounds for discharge from the City Service. I understand and acknowledge that I must report any change of address immediately to my department head and to the Department of Personnel and that failure to provide such notification shall constitute grounds for discharge from the City Service.

> By signing this residency affidavit, I acknowledge and represent that I have fully read and understand both the front and reverse sides of this residency affidavit, and further certify that the information which I have provided herein is true and correct.

On January 7, 2010, the IGO received an anonymous complaint that Plaintiff was not living within the city limits, but rather at her home on South LaSalle Street in Riverdale, Illinois. The IGO conducted an extensive investigation, the result of which led to a report to Budget

Director Holt and the Department of Human Resources. The IGO report included the following information: (1) on three separate occasions between March 10, 2010 and August 5, 2010, the IGO investigators observed Plaintiff's vehicles leaving her Riverdale home in the early morning on work days; on two of those occasions the investigators positively identified her as the driver of the vehicle, and on one of those occasions the investigators observed someone matching her description driving the vehicle; (2) during her second IGO interview on March 29, 2011, Plaintiff admitted that she had lived full time in Riverdale since at least her first IGO interview on October 21, 2010; (3) she claimed a homeowner property tax exemption for a primary residence at the Riverdale house in 2008 and 2009; (4) the vehicle registrations and insurance for her two cars listed her Riverdale address; (5) she also listed her Riverdale address on her sworn bankruptcy petition in September 2010; and (6) she never purchased City vehicle stickers. Holt Affidavit, ¶ 6, Exh. C. See also Pl. Dep., 15:12-16:9, 41:5-42:20, 59:13-60:9, 197:6-200:24, 266:16-267:2, Exh. B. Based on these findings, the IGO concluded that Plaintiff had violated the residency requirement and falsified multiple forms to the City. Accordingly, the IGO recommended that the City terminate Plaintiff. See *Carothers v. Cty. of Cook*, 808 F.3d 1140, 1150 (7th Cir. 2015) (concluding that plaintiff was not meeting her employer's legitimate employment expectations because she repeatedly violated the attendance guidelines); *Bass*, 746 F.3d at 841 (same). This extensive investigation and Plaintiff's admissions of her violations of the City's residency requirement lead the Court to the conclusion that no reasonable factfinder could conclude that Plaintiff was meeting the legitimate expectations of her employer.

Plaintiff appears to argue that she did meet the legitimate expectations of her City because she made a request for a residency waiver and that the City discriminated against her on the basis of her race and age by failing to grant her request. The City of Chicago Personnel

Rules, Rule IV, Section 5, states that the Commissioner for Human Resources may waive the residency requirement "for a particular applicant upon written request, or for a particular job based upon his or her determination that such waiver is for good cause and serves the interest of the City." However, the "waiver at the time of application does not affect the requirement to be an actual resident of the City of Chicago at the time of appointment and during employment as set forth in Section 2-152-430 of the Municipal Code of Chicago."[2] Judging by the City's Personnel Rules, it appear that the City typically grants residency waivers for applicants, not current employees, for the understandable reason that the City does not want its residency requirement to discourage applicants who do not live in the City from applying.

Plaintiff believes she was entitled to a residency waiver because she was a domestic violence victim with certain rights under the Illinois Victims' Economic Security and Safety Act ("VESSA"). VESSA makes it unlawful "for any employer to discharge or harass any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment of the individual (including retaliation in any form or manner)" because the individual "requested an adjustment to a job structure, workplace facility, or work requirement." 820 Ill. Comp. Stat. 180/30(a). See also *Daoust v. Abbott Labs.*, 2007 WL 118414, at *3 (N.D. Ill. Jan. 11, 2007) (discussing VESSA). VESSA requires that employers make a "reasonable accommodation" including "an adjustment to a job structure, workplace facility, or work requirement." 820 Ill. Comp. Stat. 180/30. If IDOL "finds that a violation did occur," VESSA permits the following relief: "(A) damages equal to the amount of wages, salary, employment benefits, public assistance, or other compensation denied or lost to such individual by reason of the violation, and the interest on that amount calculated at the prevailing rate; (B) such equitable relief as may be appropriate, including but not limited to hiring, reinstatement,

---

[2] Section 2-152-430 was renumbered as Section 2-152-050, effective April 13, 2011.

promotion, and reasonable accommodations; and (C) reasonable attorney's fees, reasonable expert witness fees, and other costs of the action to be paid by the respondent to a prevailing employee." 820 Ill. Comp. Stat. Ann. 180/35.

Plaintiff believes that she should have received a residency waiver as an accommodation because she initially left her boyfriend's apartment on South Langley in Chicago on July 10, 2009 on account of domestic violence. Indeed, Plaintiff brought a claim before the Illinois Department of Labor ("IDOL") asserting that the City had interfered with her attempt to exercise her rights under VESSA, particularly by failing to post information about employee's rights under that state statute. Following a state administrative hearing between the parties on July 30 and 31, 2012, IDOL concluded that the City failed to engage her in the process and to accommodate her under VESSA. In the Director's Final Decision and Order, IDOL ordered various relief including that the City "[c]ease and desist from interfering with VESSA rights of its employees" and take various affirmative steps "necessary to effectuate the policies of the act" including "[p]ost conspicuously a summary of the requirements of the Act on the premises of the employer," and implement "a VESSA training program for its managers." See [43-1] at 7-8. Specifically for Plaintiff, IDOL ordered the City to "offer [Plaintiff] reinstatement to her former position, or if her former position" no longer existed "a substantially equivalent position" as well as "make her whole for all lost earnings" plus the 9% statutory interest compounded pursuant to 735 Ill. Comp. Stat. 5/2-1303. *Id.* at 8. If the City could not comply with the agency's order of reinstatement, IDOL ordered the City "to pay [Plaintiff] one year's salary and benefits as front pay" and indicate in her personnel record that her termination was "a voluntary resignation." *Id.* at 8.

The fact that Plaintiff was successful in her VESSA claim in IDOL does not entitle Plaintiff to relief under federal law for either age or race discrimination. Plaintiff's successful litigation of VESSA claim does not permit the Court to ignore the fact that she violated the City's personnel policies by failing to file a change of address form for nearly two years after moving out of the South Langley location in July 2009 and falsifying information in her April 2011 change of address form. To be sure, IDOL applied the direct method and indirect method of analysis used by the Court in the Title VII context. See [43-1] at 2 (explaining that VESSA claims use the same analysis for claims brought under the Illinois Human Rights Act, which, in turn, is "the same test that is applied under Title VII"). But in Plaintiff's VESSA litigation, the relevant protected status was being a victim of domestic violence, not her race or her age. IDOL ordered the City to provide various forms of relief to Plaintiff, but that administrative record does not include any allegations, let alone findings, of the City's discrimination against Plaintiff based on her race or age.

Thus, even if the Court were to assume that Plaintiff's successful administrative claim under Illinois state law were sufficient to establish that she was meeting the legitimate expectations of her employer, there is no overlap in the legal issues between Plaintiff's VESSA claims before IDOL and her federal claims before this Court. Her administrative proceeding before IDOL dealt with whether the City violated VESSA, whereas the Court here must determine whether the City terminated Plaintiff based on her race or age. Plaintiff speculates that had she received a residency waiver under VESSA she would not have been terminated, and that she never intended to relinquish her residency in the City, Pl. Resp. at 6, but Plaintiff was aware that during her employment with the City that her failure to reside in the City as well as

her failure to report an address change would be grounds for her discharge. Def. SOF at ¶ 7, 11, 12.

In any event, even if Plaintiff had met the legitimate expectations of the City, Plaintiff cannot identify a similarly-situated employee who was treated more favorably. Under the similarly-situated analysis, the Court examines "whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that would allow a jury to reach an inference of discrimination or retaliation." *Carothers*, 808 F.3d at 1150 (alterations and quotation marks omitted). Typically, such analysis "involves examining whether the two employees shared the same supervisor, were subject to the same standards and had engaged in similar conduct, without significant distinguishing factors justifying the differential treatment," but it is a "flexible analysis," guided by "common sense." *Id.* (citation omitted). The most obvious similarly-situated employees for Plaintiff's (and the Court's) purposes would be other staff in the Budget Office. However, Plaintiff admitted in her deposition that she could not identify any City employee—in OBM or elsewhere—who engaged in one or more of the same violations of the residency requirement but was not fired. See Pl. Dep., 240:10-22.

Plaintiff points to the experience of Cherie Travis, the Executive Director of Chicago Animal Care and Control as a similarly-situated employee, but that comparison is inapt. Ms. Travis received a six-month waiver of the residency requirement, followed by two additional extensions of one-month each. See [109], Exh. 6. The Executive Director of a City Office is not similarly-situated to Plaintiff, who was an analyst, albeit a senior one, in another office within City Hall. Furthermore, Plaintiff testified that she did not know Ms. Travis' race or age, but averred that "she's not black." See Pl. Dep., 150:11-23. Even if they were comparable positions,

Ms. Travis's experience highlights why Plaintiff's situation was distinct. As a City employee, Plaintiff was complying with the residency requirement and then moved out of Chicago for an extended period of time. By contrast, Ms. Travis was not a City resident when she applied for the position. This distinction between applicant and current City employee makes good sense. As noted above, the City presumably does not want to prohibit otherwise desirable job candidates from even applying for jobs with the City because of the residency requirement and sometimes grants waivers to allow new employees to manage the challenges of uprooting oneself and/or one's family.

The Court next considers whether Plaintiff's Supplemental Exhibit 11 provides the Court with any evidence from which a reasonable factfinder could determine that similarly-situated employees were treated differently from Plaintiff. The Court granted Plaintiff's motion to include Exhibit 11 in the record over Defendant's objection. See [115]. That exhibit is made up of a two-page chart that lists race, ethnic origin, job title, and department name of eighteen City employees in the Department of Finance. See [111-2]. It is unclear from the document itself whether it is derived from the City's records. Plaintiff argues this chart demonstrates a "disparity between race White and other minorities (10 race White versus 2 race Black or African American Deputies within the Department of Finance)," which is "indicative of a pattern of hiring/staffing within the City of Chicago across all departments." [111-1] at 2. Plaintiff did not establish who created the chart or compiled the information that the chart contains, and Plaintiff has not established that she is competent to testify about the racial makeup of the City's Department of Finance staff. Therefore, the Court cannot consider this evidence at summary judgment. See *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) *cert. denied* 135 S. Ct. 2892 (2015) ("Evidence supporting or opposing summary judgment must be admissible if

offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony.")

In any event, even if the Court were to consider Supplemental Exhibit 11, it is not clear how this information could support Plaintiff's prima facie case. The information does not show that a similarly-situated City employees were granted residency waivers or retained despite personnel violations. Instead, Plaintiff's argument concerning this exhibit sounds in disparate impact, which is not related to the disparate treatment claims before the Court. Finally, assuming for the sake of argument that some of the employees listed in this exhibit received residency waivers, these City employees are in a different department, have different titles, and reported to different supervisors than Plaintiff. Thus, the Court cannot, even with making every inference in Plaintiff's favor, conclude that Plaintiff has made out a *prima facie* case under either Title VII or the ADEA.

### C. Pretext

The Seventh Circuit has suggested that if a plaintiff "has no direct evidence of discrimination and is therefore confined to the [indirect] formula, he must prove that he was meeting (or at least that there is a genuine issue of whether he was meeting) his employer's bona fide expectations, *before* he can force the employer to produce the reasons for why he was fired or otherwise subjected to adverse action." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir. 1997) (emphasis added). Thus, if Plaintiff had made out a *prima facie* case of discrimination under either Title VII or the ADEA—which she has not (see above)—Plaintiff would still need to rebut the City's explanation for terminating her. As noted above, there were three: (1) that Plaintiff failed to notify the City when she moved out of Chicago and to Riverdale, Illinois from at least July or August 2010 to March 2011, (2) that she failed to submit a change of

address form to notify the City that she had moved from the South Langley residence as of July 10, 2009, and (3) that she falsified information in her April 2011 change of address form. Plaintiff must "present facts to rebut each and every legitimate, non-discriminatory reason advanced by the [City] in order to survive summary judgment." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001). If the City terminated Plaintiff because it "honestly believed" she had violated her employment agreement in each of these three respects—even if all of these reasons were "foolish, trivial, or baseless"—Plaintiff loses. *Id.*

To show the City's explanation was pretextual, Plaintiff "must present evidence suggesting that the employer is dissembling." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (citation and quotation marks omitted). "[T]he only question" for the Court "is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (citation and quotation marks omitted). To meet this burden, Plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Bates v. City of Chicago,* 726 F.3d 951, 956 (7th Cir. 2013).

The Court need consider Budget Officer Director Holt's credibility on her stated reasons for her termination only after Plaintiff has offered "specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). See also *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) (characterizing Plaintiff's burden as "to squarely rebut the articulated reason for her discharge"). On the other hand, "if the stated reason, even if actually present to the mind

of the employer, wasn't what induced him to take the challenged employment action, it was a pretext." *Forrester v. Rauland–Borg Corp.,* 453 F.3d 416, 418 (7th Cir. 2006).

Plaintiff argues that the City used these residency requirement violations as a pretext to replace Plaintiff with a younger, white budget analyst, Megan McNally. McNally was hired as a Senior Budget Analyst in the City's Budget Office on September 30, 2011—more than three weeks before Plaintiff was fired on November 15, 2011. Such an argument demands that the Court accept Plaintiff's theory that the IGO launched an investigation that spanned two Budget Officer Directors so as to furnish Budget Director Holt with the pretext to fire Plaintiff on the account of Plaintiff's age or race even though Plaintiff admits that Holt did not know Plaintiff's race or age when she reviewed the IGO's report detailing Plaintiff's violations of the City's residency requirement. Plaintiff's theory also rests on the premise that the anonymous individual who contacted the IGO, the IGO, the Budget Director at the time of Plaintiff's termination, the Budget Director's immediate predecessor, and the Human Resources Department all coordinated their actions in a discriminatory conspiracy to remove Plaintiff. The Seventh Circuit has "typically been skeptical of such elaborate plot theories," *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (citations omitted), and the Court can find no evidence in the record to buttress Plaintiff's theory that "the residency issue was a smoke screen to cover up the Title VII and ADEA violations." Pl. Aff. at 5. Such a theory is particularly implausible given that, according to Plaintiff's response to Defendant's Statement of Facts, Holt became Budget Director on May 15, 2011—after both of IGO's interviews with Plaintiff. Pl. Resp. at ¶ 44. See also Def. SOF at ¶ 24 ("Holt's predecessor Eugene Munin was the Budget Director 'at the time of * * * most of [the] events' at issue in this lawsuit.") (quoting Pl. Dep. 160:9-12). In her

affidavit, Holt states that she had no knowledge that the IGO had even conducted an investigation into Plaintiff's residency until she received the IGO's report. Holt Aff. at ¶ 3.

Furthermore, the relevant question for pretext is not whether the City's reason for firing Plaintiff was mistaken or ill-advised, but rather whether "it was an honest belief and not a pretext for age [or race] discrimination." *Widmar v. Sun Chem. Corp.*, 772 F.3d at 465. On this record, Budget Director Holt relied on the IGO investigation and its recommendation of termination and fired Plaintiff. Perhaps, Budget Director Holt should have rejected the IGO investigation, but Plaintiff has not provided the Court with any evidence from which a reasonable factfinder could conclude that the City's investigation into her violation of the residency requirement or falsifying her change of address forms were pretexts for firing Plaintiff on account of her race or age. Plaintiff has provided the Court with "nothing more than speculation" that the residency violations furnished the City with a "mask for discrimination." *Id.* See also *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997) ("if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed").

As the Seventh Circuit has observed, in the employment discrimination context, "when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). Plaintiff cannot defeat summary judgment because she has not "present[ed] evidence showing that * * * a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason." *Id.* (citation and quotation marks omitted). Plaintiff could not show a genuine dispute of material

fact that a similarly-situated employee was treated more favorably, that she met the City's legitimate expectations, or that the City's stated reasons for terminating her—her violation of the residency requirement and her falsification of signed declarations—were pretextual. Accordingly, the Court concludes that Plaintiff has not established a prima facie case of discrimination under Title VII or the ADEA, and thus grants summary judgment to the City on Plaintiff's race and age discrimination claims.

## IV. Conclusion

For the reasons stated above, the City's motion for summary judgment [105] is granted.


Dated: March 16, 2016

_____
Robert M. Dow, Jr.
United States District Judge